## SECRET PROFITS OF OFFICER OF CORPORATION.

Circuit Court of Cuyahoga County.

JOHN BECK v. SIMON FISHEL.

Decided, June 7, 1909.

*Corporations—Duty of Officer to Make Full Disclosure of Terms of Sale of Corporation Property—Stockholders' Right to Share In Secret Profit of Officer.*

The president and general manager of a corporation induced all the stockholders to agree to a sale of all the corporation assets at a price which would net them 200 per cent. on their investment: when stating the proposition to them he also stated that he expected to make a good thing for himself over and above what the others made; it afterwards turned out that he received 1450 per cent. for his holdings and a contract on his part not to engage in the business for a term of years. *Held:* That his disclosure was not full enough to protect him in actions thereafter brought by one of the stockholders for an accounting, after discovery of the real price received for the property.

*Smith, Taft & Arter,* for plaintiff.

*Max P. Goodman* and *White, Johnson, McCaslin & Cannon,* contra.

MARVIN, J.; WINCH, J., and HENRY, J., concur.

The plaintiff in this action seeks to have the defendant make an accounting of moneys received by him on the sale of certain stock in the Fishel Brewing Company, a corporation which was sold by the defendant for the plaintiff, and he seeks to recover whatever amount such accounting shall show as due to him from the defendant.

The facts are these: The Fishel Brewing Company was a corporation; it was organized in 1904, and began business June,

1905, and was sold out to the Cleveland & Sandusky Brewing Company after having done business about nineteen months. The paid up capital stock of this corporation was $221,000, of which the defendant owned $25,000, the remaining $196,000 being owned by other parties, $5,000 of which was owned by the plaintiff. The defendant was the president and general manager of this corporation. The plaintiff aside from owning stock had no connections with the corporation and no acquaintance with its business. The business for the time the corporation did business was exceedingly profitable; the net profits for the year 1906 on this capital of $221,000 was $85,000. The defendant at the annual meeting in January, 1907, made a report showing the financial situation of the company, and showing this net profit for the year 1906. The plaintiff was not present at the stockholders' meeting at which this report was made, and had no actual knowledge of what the profits of the business were. On the 13th of February, 1907, the defendant sent notice, in writing, to the stockholders of this corporation requesting that they meet at the office of the company on the 15th of February, at 2 o'clock in the afternoon, and that they bring their certificates of stock with them. The plaintiff and most of the stockholders responded to the call; the plaintiff took with him his certificate of stock, and was there introduced to Mr. Fishel, with whom up to that time he had no personal acquaintance. He was informed by Mr. Fishel that there was an opportunity to sell out the assets of the corporation for two hundred per cent. of the par value of the stock, and at the suggestion of Mr. Fishel, the plaintiff and most of the other stockholders signed a writing which authorized Fishel to transfer this stock to the Cleveland & Sandusky Brewing Co. for 200 per cent. of its face value.

On the 22d of February, 1907, the defendant, pursuant to the authority given him by the stockholders, sold the entire assets, excepting only the cash of the company in the bank or in the hands of its treasurer, and the horse and buggy used personally by the president of the company, to the Cleveland & Sandusky Brewing Company. By the contract of sale the Fishel Brewing

Company agreed to furnish contracts of Simon Fishel and his son, Theodore Fishel, that each "will not at any time within ten years from the date of transfer, either directly or indirectly engage or be in any manner whatsoever interested, either as principal, or agent, or employe, or stockholder in the business of manufacturing or vending beer in or within the radius of 150 miles from the city of Cleveland, state of Ohio, nor aid or assist anyone else to do so within said limit, except only as a stockholder of or employe of or with the consent in writing of the Cleveland & Sandusky Brewing Company, its successors and assigns."

The contract further provided that the Fishel Company would procure and furnish "an agreement from Simon Fishel that he will not for the period of ten years from the date of the acceptance hereof, sell any of his property which he may now own or which he may own during said period, without first giving a reasonable opportunity to the party of the second part to purchase the same from him on such terms as he would be willing to accept from any other party, and secondly, that during said period he will not lease for saloon purposes to any other party any property which he may now own or which he may own during said period, without giving the party of the second part, its nominees or assigns, a reasonable opportunity to lease said property from him on the same terms which he would accept from another party."

The amount paid by the Cleveland & Sandusky Brewing Company was $850,000. Out of this amount the debts of the Fishel Company, which amounted to about $95,000, were to be paid, leaving after the payment of debts about $775,000. Out of this amount the defendant paid to the plaintiff and to the other stockholders (excepting himself) two hundred per cent. (200%) of the par value of their holdings. This required $392,000, still leaving in the hands of the defendant the sum of $363,000, which was 1450% of the par value of his stock, whereas the other stockholders received but 200%.

It is urged that a part of this $363,000 was paid because of the agreement that neither the defendant nor his son would in any

wise engage in the brewing business within 150 miles of Cleveland for the period of ten years.

The defendant was a man of large experience and superior attainments for the conducting of the brewing business, and without question the Cleveland & Sandusky Brewing Company was very desirous of putting an end to any competition on his part in the business, and they could well afford to pay a liberal amount to prevent such competition. They were also desirous of putting an end to the competition of the Fishel Brewing Company. The plant of this company was the best (Mr. Fishel says) of its size in or about the city of Cleveland, and it had done so large a business as greatly to interfere with and lessen the business of the Cleveland & Sandusky Brewing Company. The fact that this company had such an excellent plant and that its competition was so prejudicial to the Cleveland & Sandusky Brewing Company was due in great measure undoubtedly to the ability and experience of the defendant. The fact that its plant was of the very best was because it was erected and equipped under the direction and management of the defendant, but to the extent that the Fishel Company was a dangerous competitor and would justify the paying by the Cleveland & Sandusky Brewing Company a large price in excess of the physical value of the assets, was the property of the Fishel Company, notwithstanding the fact that this business was due in great measure to the efforts of the defendant, for the defendant was its employe, he was paid a salary of $6,000 a year to manage this business, and if the good will of the concern was enhanced in value because of his superior management, the company was entitled to the benefit of it; but to the extent that in the future it was desirable to so tie up Mr. Fishel that he could not compete with the Cleveland & Sandusky Brewing Company, was a matter for which he alone would be entitled to be compensated.

It will be noticed, however, that in the contract of sale no special amount was fixed for this contract of Fishel to remain out of the business, except as he should be employed by the Cleveland & Sandusky Brewing Company, so that it is left entirely uncertain as to what the last named company was to

pay as a consideration for this refraining, on Fishel's part, to engage in the business. If any attempt had been made to arrive at the value of this part of the contract it would seem as though the compensation which Fishel had theretofore received for his services would be taken as a basis upon which to make the computation. The highest salary which he had ever received, so far as appears from the evidence, he received from the Cleveland & Sandusky Brewing Company for the period of six years, ending in February, 1904. During that period he had acted as general manager of the Cleveland & Sandusky Brewing Company at a salary of $8,500 per year, and this at a time when the business was not interfered with or threatened by the unfriendly legislation which Fishel says had already reduced and is is likely very greatly to reduce the sale of the product of breweries.

It would hardly seem that a greater amount would be taken into account in estimating the value of his services for the future, with all this legislation of which he speaks, interfering with the business, than the compensation which he received during the six years he was with the Cleveland & Sandusky Brewing Company. Taking that as a basis, it will be found that if $69,000 had been paid to him for this restriction on his employment, he could have taken out $8,500 as pay for his first year, loaning the balance at 5 per cent. per annum, payable annually, and he could have received $8,500 at the beginning of each of the remaining nine years, so that under this estimate, if $69,000 had been allowed him as compensation for his keeping out of the brewery business, he might have done nothing and still have had as much as he could have earned at the largest salary that he had ever received and be paid each year in advance. If this amount had been taken out of the $363,000 there would still have been in his hands 1175 per cent. of the value of his stock, but he says that he communicated to the stockholders such facts as relieved him from accounting to them for all that was received for this property, and the facts in relation to such communication to the stockholders are these:

On the 15th day of February, after the plaintiff had signed the writing which he signed and to which attention has already been called, an informal meeting of the stockholders was held in a room at the brewery plant, at which Fishel made some remarks. This meeting was attended by the plaintiff. Whether he remained until its conclusion or not we do not determine, but he was there when Fishel made the statement, testified to by him, as appears on page 303 of the bill of exceptions. That statement was:

"*Gentlemen:* The Cleveland & Sandusky Brewing Company is after us and want to buy us out. The Cleveland & Sandusky Brewing Company isn't after the plant or after you to love you or me, they are after the trade and they want to get me and my son out of the way, and here is the option, and if we can get from them—they didn't make any offer yet, and I did not neither—and if I can get what I made up my mind here—If I can get all the money back you put in, and if I can get the bonds, at the market price what it was on that date, 94½, and if I can get preferred stock at 74, and I wouldn't take no common stock under no means, and then we make the deal. Besides that I must make a great big sum for myself and for my son. If I will get that, now will you be satisfied."

He says that after having said this he asked if there was anybody present who had anything to say against it, because if he had, he should say so then and the deal would be off, because he says he would not go a step further, and then he added, "if there is one man who has the idea it should not be done, he should express himself and the deal will be off and we will be friends again."

Nobody made any objection. All seemed to be well pleased that they were getting two hundred per cent. for their stock. One of them, a Mr. Ryan, stated in a loud voice so as to be heard by all, that he hoped that Fishel would make a million. He seems to have been extraordinarily well pleased, for he says that theretofore when he has held stock in a corporation, his dividends consisted in assessments on his stock, whereas here he was getting 200 per cent. for his stock. It is perfectly manifest that all of the stockholders at that meeting were greatly rejoicing that the

sale could be made at 200 per cent. and were willing that Fishel should make a good thing besides.    At this meeting of the stockholders a resolution, somewhat remarkable, was adopted.    This resolution was introduced by Max P. Goodman, the man through whom the transfer of the company from Fishel to the Cleveland & Sandusky Brewing Company was made.    The last clause of this resolution reads:  "Be it further resolved, that we admire the candour of our president in stating that if the sale were made he expected to receive a good return himself, irrespective of the proposition submitted to the stockholders."

Unless it had occurred to somebody friendly to Fishel that it might be that when the stockholders came to learn that he had received 1450 per cent. on his stock, while they had received but 200 per cent., or had received 1450 per cent. for his stock, including his contract worth at the outside not more than $69,000, not to compete with the Cleveland & Sandusky Company for ten years, that they would not feel that he was especially entitled to thanks for his "candor" in stating that if the sale were made, he expected to receive a good return himself.

Nothing has thus far been said in reference to the restriction of the sale or lease of any real estate of Fishel, that is, giving the Cleveland & Sandusky Brewing Company an opportunity to purchase or lease on as good terms as he could get from anybody else, and the reason nothing was said about it is this was in nowise a restriction which could interfere with Fishel's getting the highest price either upon lease or sale of any or all of his real estate.

That the law requires of an officer of a corporation the utmost good faith in dealing with his stockholders is recognized everywhere; he is a trustee for his stockholders, and as such is bound to communicate to them the facts which affect the value of their property, and in case of the sale of the property. the facts known to him which affect the price at which the property is sold.    Ordinarily the officer of a corporation is bound to account to his stockholders for the avails of any sale made by him, as any other trustee is bound to account to his beneficiary for the avails of sales made by him, and he is ex-

eased from paying over to his stockholders each his aliquot part of the avails of the sale, when, after full and fair disclosure, the stockholder consents to the officer retaining part of such avails as compensation to himself. See *Oliver* v. *Oliver*, 119 Georgia, 362; *Stewart* v. *Ferris*, 66 L. R. A., 261; *The New York & N. N. Railway Co.* v. *Hudson*, 16 Beavan's, 485; *3 Thompson on Corporations*, Section 4024, and cases cited.

In Section 4025 of *Thompson on Corporations*, this language is used:

"The rule does not mean that a trustee is absolutely prohibited from making a profit out of his trust relation. It means that he must not make a secret profit out of it. His duty is not to avoid wholly the doing anything for his own benefit, for the class of trustees we are considering, the directors of corporations, are generally interested in the subject-matter of the trust. His obligation to the beneficiaries in the trust is to make a full, fair and complete disclosure of all the circumstances attending any transaction which will benefit himself in any matter different from the manner in which all the shareholders will be benefitted. If the body of the shareholders are made fully acquainted with the nature of the transaction, and agree to it, and agree that he shall have and retain the special benefit that may accrue from it, then they will not be heard afterwards to claim that this benefit shall be surrendered up to them as a profit, which he ought not, in good conscience, to retain."

In the case of *Bristol* v. *Scranton*, 57 Fed. Rep., 70, to which attention is called by counsel for the defendant, it appears that William W. and Walter Scranton were brothers, that they were the officers and managers of a corporation, that they sold the assets of that corporation to another corporation and at the same time each entered into a contract for a large consideration that he would not compete with the purchaser in the business carried on by the purchasing corporation, and the court held that under the facts in that case the stockholders of the selling corporation were not entitled to have that which was paid to these individual men as an inducement for them to refrain from competing with the business of the purchasing corporation. They reason that the amount paid to each was a fixed and certain amount; that it was not an unreasonable amount; that it was

contained in a separate contract; that the stockholders of the selling corporation received not only all that their stock was worth, but all that the purchasing corporation paid for it. In the opinion this language is used on page 78:

"Undoubtedly the rule is that one acting in a representative or fiduciary capacity is not allowed so to deal with the subject-matter of his agency or trust as to benefit himself privately, and the agent or trustee who thus makes a profit out of his agency or trusteeship, must account for the same to his principal or *cestui que trust;* and it may be conceded that the rule applies, as a principle of public policy without regard to the actual fairness of the transaction, or the merits of the service rendered or the price paid in case of a sale or purchase."

The court then goes on to show that the amount paid to these two officers was paid to them upon the personal contract of each and was in no proper sense paid as a part of the purchase price of the selling corporation. Even in this case the court says:

"It was unfortunate, and we think a mistake, that the Scrantons did not give the plaintiffs full information with respect to their individual contract before the stockholders meeting, but in our judgment they are not justly chargeable with intentional concealment."

Under the facts and the decision in this last named case we do not feel that it aids the defendant in the present action. At the time of the meeting on the 15th day of February, Fishel did not know, he says, how much he would be able to obtain. At that time he did not understand that there was to be a contract which would prevent either him or his son from competing in the brewery business with the Cleveland & Sandusky Brewing Company. This we find from his testimony as to what occurred later, when he had a meeting with a committee of the Cleveland & Sandusky Brewing Company, at which meeting, for the first time, it was suggested that he would be asked to enter into a contract to refrain from engaging in the brewing business. He says he was surprised when this was proposed to him, and that he at once made up his mind that he must have more than he had before expected to demand.

We find that the statement made by Fishel to his stockholders after the plaintiff and many others had signed the contract authorizing the sale of their stock, that he would make a good thing for himself besides obtaining 200 per cent. for them, falls a long way short of being a disclosure which would cause any of them to dream that he was to get either 1450 per cent. or 1175 per cent. for his stock, while they got but 200 per cent. for theirs.

The result is we find that the plaintiff is entitled to the accounting for which he prays. We have not the exact figures upon which to make the accounting, but it can probably be made by counsel very readily, and when such accounting is had the plaintiff will be given a judgment for his proportionate share of the entire amount received on the sale of this property.